In re Pateel BOYAJIAN, Debtor.

In re Salpy Boyajian, Debtor.

New Falls Corporation, Appellant,

v.

Pateel Boyajian, Appellee.

New Falls Corporation, Appellant,

v.

Salpy Boyajian, Appellee.

BAP Nos. CC–06–1085–DKMo,
CC–06–1086–DKMo.

Bankruptcy Nos. SV 04–11929–
KT, SV 04–11930–KT.

Adversary Nos. SV 04–01317–
KT, SV 04–01318–KT.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted on Feb. 22, 2007.

Filed March 30, 2007.

Jeannine E. Del Monte, Hemar, Rousso & Heald, Encino, CA, for New Falls Corporation.

Alan G. Tippie, Los Angeles, CA, for Salpy Boyajian.

Before: DUNN, KLEIN, and MONTALI, Bankruptcy Judges.

## OPINION

DUNN, Bankruptcy Judge.

The bankruptcy court determined as a matter of law that in order for an assignee creditor to prevail in an exception to discharge adversary proceeding brought pursuant to § 523(a)(2)(B),[1] the assignee creditor must have reasonably relied on the materially false financial statement provided by the debtor. We REVERSE.

## I. FACTS

On July 13, 1999, Blue Diamond Straw & Toothpick Company, Inc. ("Blue Diamond") entered into a lease agreement ("Epic Lease") with Epic Funding Corporation ("Epic"). Pateel Boyajian ("Pateel") and Salpy Boyajian ("Salpy"), sisters (collectively "Sisters"), were Blue Diamond's President and Vice President, respectively. Pateel and Salpy each signed a Continuing Guaranty of Indebtedness, guaranteeing Blue Diamond's obligations

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated prior to the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 ("BAPCPA"), because the cases from which these appeals arise were filed before the BAPCPA effective date (generally October 17, 2005).

under the Epic Lease ("Guarantees"). In conjunction with signing the Epic Lease and the Guarantees, Pateel and Salpy each provided Epic a personal financial statement dated June 30, 1999, reflecting a personal net worth of $680,162 and $719,382, respectively ("Personal Financial Statements").

By letter dated February 15, 2000, Blue Diamond advised Epic of cash flow problems that were responsible for delayed payments to Epic. Epic sold all of its rights, title and interest in the Epic Lease to Cupertino National Bank dba The Matsco Companies ("Cupertino National Bank") on March 28, 2002.[2] Ultimately, in May 2002, Blue Diamond defaulted on its obligations under the Epic Lease, and Pateel and Salpy defaulted on the Guarantees. On October 24, 2002, Cupertino National Bank commenced an action in Contra Costa County Superior Court, and a default judgment was entered on January 22, 2003, against Blue Diamond, Pateel and Salpy, jointly and severally, in the amount of $193,132.69, representing amounts due under the Epic Lease and the Guarantees ("Judgment").

Cupertino National Bank then assigned all of it rights, title and interest in the Judgment to Stornawaye Capital, LLC ("Stornawaye") on May 8, 2003. Stornawaye conducted judgment debtor examinations of Pateel and Salpy on November 12, 2003. Subsequently, Stornawaye assigned all of its rights, title and interest in the

Judgment to New Falls Corporation ("New Falls") on February 19, 2004.

Pateel and Salpy each filed a voluntary chapter 7 petition on March 16, 2004. New Falls brought adversary proceedings against Pateel and Salpy in their respective bankruptcy cases, seeking a declaration that the Judgment was nondischargeable pursuant to § 523(a)(2)(B), based on the Personal Financial Statements, which New Falls alleged were fraudulent. On cross-motions for summary judgment, the bankruptcy court ruled that because New Falls itself had not relied on the Personal Financial Statements, as a matter of law, it was not entitled to prevail on a cause of action under § 523(a)(2)(B). The bankruptcy court denied New Falls' motions for summary judgment, granted Pateel and Salpy's motions for summary judgment, and entered summary judgments in favor of Pateel and Salpy.[3] New Falls appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158.

## III. ISSUE

Whether the "reasonable reliance" required by § 523(a)(2)(B)(iii) for a nondischargeable debt incurred with the use of a false financial statement in writing requires reasonable reliance not only by the

---

**2.** References to the sequence of assignments are found in the Adversary Proceeding Complaint, pp. 4–5.

**3.** New Falls' complaints against Pateel and Salpy also included a cause of action under § 523(a)(2)(A), alleging essentially that Blue Diamond was owned and operated by Rostom Boyajian, Pateel and Salpy's father, and that Pateel and Salpy misrepresented themselves as President and Vice President of Blue Diamond because their father, having twice

previously filed bankruptcy, was not creditworthy. The bankruptcy court also granted Pateel and Salpy's motions for summary judgment on this cause of action, stating: "The problem that you have with the [§ ] 523(a)(2)( [A] ) is that it is clear that the credit decision was made knowing that the father was involved with the business. It's right there in the paperwork." New Falls has not appealed this decision of the bankruptcy court.

lender who extended the original credit to a debtor, but also by an assignee.

## IV. STANDARDS OF REVIEW

 Construction of a statute presents a question of law that we review de novo. *Duffy v. Dwyer (In re Dwyer)*, 303 B.R. 437, 439 (9th Cir. BAP 2003). We review a bankruptcy court's conclusions of law de novo. *Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 270 (9th Cir.1987). We review summary judgment orders de novo. *Tobin v. San Souci Ltd. P'ship (In re Tobin)*, 258 B.R. 199, 202 (9th Cir. BAP 2001). Viewing the evidence in the light most favorable to the non-moving party, we must determine "whether there are any genuine issues of material fact and whether the trial court correctly applied relevant substantive law." *Id.*

## V. DISCUSSION

A. *Section 523(a)(2)(B) and its Reliance Element*

 This case turns on the meaning of a provision of the Bankruptcy Code. Accordingly, the place to begin our analysis is with the language of the subject and related statutory provisions.

Exceptions to discharge of debts in bankruptcy are specified in § 523(a). The subsection at issue in this appeal is § 523(a)(2)(B), which provides:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

. . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

The specific question is whether New Falls, an assignee of Epic, is the "creditor to whom the debtor is liable" for purposes of § 523(a)(2)(B)(iii) "reasonable" reliance or, instead, whether Epic is the only creditor whose reliance matters. In other words, must the assignee prove, as required by the bankruptcy court, that it independently "reasonably relied" on a materially false written financial statement?

At oral argument, the Sisters conceded that three of the four essential elements prescribed by § 523(a)(2)(B) make sense only in connection with the extension of credit by the original creditor. Specifically, they concede that subparagraph (i) requiring that the statement be materially false, subparagraph (ii) requiring that the statement address financial condition, and subparagraph (iv) requiring intent to deceive all relate to the original creditor at the time of the original transaction and not to that creditor's assignee at some later time.

Thus, the question boils down to whether subparagraph (iii) requiring reasonable reliance on the statement "by the creditor to whom the debtor is liable" must, as the bankruptcy court held, be reevaluated each time the claim is assigned.

The Sisters assert that a "plain meaning" interpretation of the phrase "by the creditor to whom the debtor is liable" requires each subsequent assignee to demonstrate its own "reasonable reliance" on the

debtor's original materially false statement concerning financial condition that was made or published with intent to deceive. They ask that we focus solely on the language of § 523(a)(2)(B)(iii), specifying reasonable reliance by "the creditor to whom the debtor is liable for such money, property, services, or credit," and on the definition of "creditor"[4] under the Bankruptcy Code. The Sisters assert that § 523(a)(2)(B)(iii) does not specify reasonable reliance by the "original creditor" or the "initial creditor," just the "creditor." Accordingly, based on the "plain meaning" of § 523(a)(2)(B)(iii), viewed separately from the balance of § 523(a)(2)(B), if the "creditor," New Falls, cannot show its own reasonable reliance on the Personal Financial Statements, which apparently it cannot, it is the Sisters' position that New Falls cannot prove a required element of a § 523(a)(2)(B) cause of action, and the bankruptcy court's summary judgment rulings were correct.

However, it is not appropriate to consider the language of § 523(a)(2)(B)(iii) in isolation for a number of reasons. First, it is not consistent with the general provision of § 523(a)(2) that a debt is excepted from discharge "to the extent obtained by" the circumstances described in subparagraph (B), which inherently implies a unity of time.

Further, if Congress intended that the limited exceptions to discharge under § 523(a) would be further limited in the event of assignment of claims, it knew how to make such provisions explicit, and it did so with respect to obligations for alimony and support in § 523(a)(5)(A):

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—
>
> . . .
>
> (5) to a spouse, former spouse, or child of the debtor for alimony to, maintenance for, or support of such spouse or child . . ., but not to the extent that—
>
> (A) *such debt is assigned to another entity, voluntarily, by operation of law, or otherwise* (other than debts assigned pursuant to section 408(a)(3) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State). . . . (emphasis added).[5]

In addition, the Sisters' emphasis on the use of the unmodified term "creditor" in § 523(a)(2)(B)(iii) gives it a significance that Congress never intended and is inconsistent with the other provisions of § 523(a)(2)(B). Indeed, this Panel has held that an assignee can pursue a cause of action under § 523(a)(2)(B) even if the debtor's intent to deceive, for purposes of § 523(a)(2)(B)(iv), was directed at the assigning party. *See Tustin Thrift & Loan Ass'n v. Maldonado (In re Maldonado)*, 228 B.R. 735, 738–740 (9th Cir. BAP 1999).[6]

At oral argument, the Sisters' counsel argued from the general principle that ex-

**4.** Section 101(10)(A) defines a "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief [filing of the bankruptcy petition] concerning the debtor."

**5.** This specific assignment exception is underlined by § 522(f)(1)(A)(ii)(I), which provides that a judicial lien for alimony, maintenance or support of a spouse or child cannot be avoided except to the extent that the debt secured by such judicial lien has been "assigned to another entity, voluntarily, by operation of law, or otherwise."

**6.** The issue before us was not raised before the Panel in *Maldonado*, as reasonable reliance by the assignee creditor was conceded. *Id.* at 737.

ceptions to discharge are narrowly interpreted in favor of debtors (*see, e.g., Quarre v. Saylor (In re Saylor)*, 108 F.3d 219, 221 (9th Cir.1997)) and pointed to the reasonable reliance element under § 523(a)(2)(B)(iii), missing from § 523(a)(2)(A), dealing with other frauds, as having a "moderating" impact in light of the realities of trafficking in financial obligations in our economy, citing *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). However, the "moderating" concerns discussed in *Field v. Mans* and the underlying legislative history clearly relate to the practices of certain *original* lenders and have nothing to do with assignment law or the rights of assignees.[7]

> The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.

*Id.* at 76–77, 116 S.Ct. 437.[8]

### B. *The Bankruptcy Court's Decision*

In reaching its decision, the bankruptcy court relied upon the language of § 523(a)(2)(B)(iii) and *General Electric Capital v. Bui (In re Bui)*, 188 B.R. 274 (Bankr.N.D.Ca.1995). We disapprove *Bui* for the following reasons.

In *Bui*, General Electric Capital Corporation ("GECC"), as successor-in-interest to Levitz Furniture ("Levitz"), sought to have its debt assigned from Levitz excepted from Bui's discharge pursuant to § 523(a)(2)(B) on the basis that the Levitz Revolving Charge Application completed by Bui allegedly misstated Bui's income. Using the following analogy, the *Bui* court held that both Levitz *and* GECC must have relied on the written misstatement:

> In a situation such as this, involving a "middleman", reliance should be shown by each link in the chain of parties involved. Assume that A sells a ring to B representing in writing that it is a diamond whereas in fact it is a cubic zirconia. B sells it to C. C sells it to D and D sells it to E who discovers the truth. If A filed bankruptcy, does E have a valid cause of action against A under § 523(a)(2)? For bankruptcy purposes, should a debt be non-dischargeable *vis a vis* a person or entity to whom no misrepresentation was made? It seems clear that, at a minimum, in the absence of an applicable legal presumption, E would have to show that B, C, D and E all reasonably relied on A's original mis-

---

**7.** Likewise, neither *Field v. Mans* nor the subject legislative history address issues with respect to nonconsumer transactions, such as the Epic Lease and Guarantees concerned in these appeals.

**8.** The relevant legislative history states:

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a

basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase "I have no other debts" is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting.

H.R.Rep. No. 95–595, at 130 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6091.

representation to B.... GECC has not demonstrated ... that, first, Levitz relied on Bui's allegedly false statement, and second, that GECC also relied....

*Id.* at 279.[9]

No citation to any authority is provided by the *Bui* court for this proposition. Instead, the *Bui* court appears to have concluded that the only cases allowing exceptions to discharge based on third-party reliance on false financial statements were limited to situations where a debtor had provided a false financial statement to a credit reporting agency, which provided the service of republishing the financial statement for use by others. *Id.* at 279–80, *citing Rogers v. Gardner*, 226 F.2d 864 (9th Cir.1955).

Two courts have followed *Bui*. In *Tompkins & McMaster v. Whitenack (In re Whitenack)*, 235 B.R. 819 (Bankr.D.S.C. 1998), a law firm which represented the buyer of debtor's property failed to identify an outstanding lien in its title examination and failed to take that lien into consideration in the preparation of the closing documents. After the sale closed, the law firm discovered the unpaid lien.

When the debtor refused to pay the lien, the law firm did so, and took an assignment both of the lien claim and of any rights the buyer had against the debtor. When the debtor filed bankruptcy, the law firm sought to have its debt held nondischargeable pursuant to § 523(a)(2)(B), asserting that in signing the sale documents, which promised to convey marketable title free of encumbrances, the debtor had provided a false statement in writing with respect to his financial condition. Citing *Bui*, the *Whitenack* court stated:

A creditor to whom a Debtor's obligation is assigned, must demonstrate that not only did the assignor reasonably rely on the Debtor's false representation, but that it also relied on the false representations in deciding to receive the assignment.

*Id.* at 826. Stating that the law firm could not "divorce itself" from its active participation in the sale transaction, the *Whitenack* court found either that there was no actual reliance on the written statements, or that the reliance by the buyer and/or the law firm was not reasonable.

In *Criimi Mae Svcs. Ltd. P'ship. v. Hurley (In re Hurley)*, 285 B.R. 871 (Bankr.D.N.J.2002), a § 523(a)(2)(A) case, the court denied debtor's motion for summary judgment, to allow the plaintiff to conduct discovery on the reliance element of its cause of action. Plaintiff sought to determine if each successor-in-interest to the original lender relied on the alleged misrepresentations debtor had made with respect to environmental contamination of property secured by the loan at issue.

Other bankruptcy courts have held that where the creditor is a successor in interest to an original creditor, the creditor may establish a finding of "justifiable reliance" by showing that each successor to the original creditor relied on the misrepresentation. Although this issue has not been addressed by the courts within the Third Circuit, this court finds the reasoning of the *Bui* and *Whitenack* courts persuasive, and will follow it here.

*Id.* at 876 (citations omitted).

C. *An Assignee Steps into the Shoes of His Assignor*

The difficulty with the analysis of *Bui* and the courts that reason similarly is that

---

**9.** The analogy is neither apt nor relevant, as it appears to relate to the sale of a cubic zirconia as a diamond by "false pretenses, a false representation or actual fraud," actionable pursuant to § 523(a)(2)(A), and has nothing to do with obtaining money or credit through the use of a materially false financial statement, actionable pursuant to § 523(a)(2)(B).

no account is taken of the legal implications of an assignment. *See generally* RESTATEMENT (SECOND) OF CONTRACTS §§ 316–43 (1981) (Ch. 15 Assignment and Delegation).

 "Stated as a basic principle, an assignee merely steps into the shoes of his assignor [citation omitted]. The question of what rights and remedies pass with a given assignment depends on the interest of the parties." *State Bar v. Tooks (In re Tooks)*, 76 B.R. 162, 164 (Bankr.S.D.Cal. 1987), *citing P. Coast Agric. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir.1975). *See also* 29 WILLISTON ON CONTRACTS § 74:47 (4th ed. 2003) ("It has been held repeatedly that the assignee 'stands in the shoes' of the assignor . . . ."); RESTATEMENT (SECOND) OF CONTRACTS § 336(1) ("By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity.")

In *Tooks*, the debtor, an attorney, converted $62,000 belonging to an insurance company to his own use. A subsequent criminal restitution order obligated the debtor to reimburse the insurance company. The State Bar's Client Security Fund ("State Bar") made partial reimbursement to the insurance company in the amount of $24,200, receiving an assignment of the insurance company's rights to the extent of the payment. The debtor did not seek to discharge his obligation to the insurance company, but he did seek to discharge the State Bar's assigned claim.

The debtor filed a motion for summary judgment against the State Bar, which the bankruptcy court denied. The assignment at issue transferred "all" rights of the assignor to the State Bar, and the issue was whether, as a matter of law, the nondischargeable character of the assignee's claim was excepted from transfer. The bankruptcy court held that it was not.

Although the *Tooks* case involved causes of action under §§ 523(a)(4) and (a)(6), the analysis is equally applicable to a § 523(a)(2) cause of action. In fact, as stated by the bankruptcy court in *In re Geriatrics Nursing Home, Inc.*, 195 B.R. 34, 38 (Bankr.D.N.J.1996):

> [I]t is not sensible to argue that a purchaser of [a] claim who takes an assignment of the claim does not step into the shoes of the assignor. Neither the Bankruptcy Code nor the Bankruptcy Rules restrict the ability of an assignee to assert all the rights of a creditor. In the absence of inequitable conduct, the court cannot discern any basis for limiting the rights of an assignee of a claim.

This Panel has recognized the right of an assignee creditor to pursue an outright denial of discharge to a debtor under § 727(a). *See Ota v. Samsung Elec. Co., Ltd. (In re Ota)*, 192 B.R. 545 (9th Cir. BAP 1996). In *Ota*, the debtor owed money to a supplier to his business, and the supplier, in turn, owed money to Samsung. When the supplier experienced financial difficulties, it partially satisfied its obligation to Samsung by assigning to Samsung its claim against the debtor, prepetition. When the debtor filed for bankruptcy protection in chapter 7, Samsung filed an adversary proceeding against the debtor, seeking to deny him a discharge pursuant to §§ 727(a)(3) and (a)(5). The debtor argued that Samsung, as an assignee creditor, had no standing to object to his discharge. Our Panel disagreed, holding that "absent an improper purpose or motive, an assignee or purchaser of claims has standing to object to a debtor's discharge." *Id.* at 549. *See Luke v. Clegg (In re Clegg)*, 352 B.R. 912, 920–21

(Bankr.M.D.Ga.2006) (Whether an assignee acquires a creditor's claim pre- or post-petition, unless the assignee had an improper purpose in acquiring the claim, the assignee steps into the shoes of the assignor creditor and can assert all of the assignor creditor's rights.).

In other decisions of this Panel, the rights of assignees to bring exception to discharge actions under § 523(a)(2)(B) have been recognized implicitly. *See, e.g., Smith v. Lachter (In re Smith)*, 242 B.R. 694 (9th Cir. BAP 1999) (plaintiffs asserted judgment creditor rights of a dissolved corporation based on an assignment; no discussion of the fact or implications of the assignment on the § 523(a)(2)(B) cause of action and its elements); *Berr v. FDIC (In re Berr)*, 172 B.R. 299 (9th Cir. BAP 1994) (FDIC as successor-in-interest to a state bank; no discussion of the fact or implications of the successor interest on the § 523(a)(2)(B) cause of action and its elements).[10]

### D. *New Falls as Assignee*

As alleged in the complaint, Epic sold all of its rights, title and interest in the Epic Lease to Cupertino National Bank on March 28, 2002. Cupertino National Bank then obtained the Judgment against Blue Diamond, Pateel, and Salpy, and on May 8, 2003, assigned all of its rights, title and interest in the Judgment to Stornawaye. Ultimately, Stornawaye assigned all of its rights, title and interest in the Judgment to New Falls.[11]

Imposing a requirement that New Falls prove its own reliance, independent of Epic's, not only imposes a barrier to enforcement of its assignment rights, it makes no sense when applying the remedy made available under § 523(a)(2)(B). A similar theory was posited by the debtor in *FDIC v. Meyer (In re Meyer)*, 120 F.3d 66 (7th Cir.1997), but rejected by the court. In *Meyer*, the debtor, who had guaranteed a loan Commercial Finance made to the company of which he was an officer and director, asserted that subsequent assignments of the Commercial Finance debt precluded a nondischargeability action against him. The *Meyer* court articulated the flaws in this position.

> [Meyer's theory] is that Commercial Finance's assignment of the loan payments to its parent (then Federal Bank, now the FDIC) somehow bars the parent from pursuing Meyer for non-discharge. The theory goes like this. Meyer never misled Federal Bank; Meyer had no written or oral agreements with Federal Bank; thus, Federal Bank has no claim against Meyer. This argument betrays a fundamental misunderstanding of contract law. The fallacy in Meyer's reasoning is best laid out in this example. Creditor lends money to Debtor, based on Debtor's representations. Creditor assigns the loan to Assignee. Later, Debtor is revealed to have lied to Creditor. (The only wrinkle in this case is that Meyer is the guarantor for a defaulting Debtor.) Meyer is saying that Assignee has no legal recourse against

---

**10.** While instructive, *Smith* and *Berr* are not binding precedents in this instance, because the issue before us was not raised in either case. *See Ball v. Payco–Gen. Am. Credits (In re Ball)*, 185 B.R. 595 (9th Cir. BAP 1995).

**11.** The record does not contain a complete copy of any of the assignments. In their briefs Pateel and Salpy assert that New Falls' failure to provide a copy of the each assign-

ment compels us to affirm the bankruptcy court. The absence of the assignments for review is not significant, however, because we are faced only with the general legal issue as to whether reliance by the assignee must be demonstrated, as a matter of law, in order for New Falls to defeat the Sisters' motions for summary judgment and proceed to trial on its § 523(a)(2)(B) causes of action.

Debtor. That cannot be true: the very reason that the institution of assignment exists is to enable Creditor to transfer its rights against Debtor (Meyer) to Assignee (Federal Bank).

*Id.* at 70.

■ Pateel and Salpy make the same argument rejected by the *Meyer* court, albeit with a slight twist. They assert New Falls cannot demonstrate reliance on the Personal Financial Statements, either because they did not provide New Falls with the Personal Financial Statements, or because it was not reasonable for New Falls to rely on the Personal Financial Statements, which were nearly 5 years old at the time New Falls took its assignment of the Judgment. The former argument is squarely addressed by *Meyer.* The latter argument raises the issue of timing of fraud. However, the age of the Personal Financial Statements at the time of the assignment, any assignment, is a red herring.

> For purposes of [§ ] 523(a)(2), however, the timing of the fraud and the elements to prove fraud focus on the time when the lender ... made the extension of credit to the Debtor. In other words, [the] assignee of the Agreement ... steps into the shoes of its assignor ..., and the inquiry of whether a creditor justifiably relied on Debtor's alleged misrepresentations is focused on the moment in time when that creditor extended the funds to Debtor. *See McClellan v. Cantrell,* 217 F.3d 890, 896 (7th Cir.2000)(Ripple, Circuit Judge, concurring) (noting Congress' use of "obtained by" in § 523(a)(2) "clearly indicates that fraudulent conduct occurred at the inception of the debt, i.e. the debtor committed a fraudulent act to induce the creditor to part with his money or property.").

*Bombardier Capital, Inc. v. Dobek (In re Dobek),* 278 B.R. 496, 508 (Bankr.N.D.Ill. 2002).

■ While *Dobek* and *McClellan* are both cases decided under § 523(a)(2)(A), because the "obtained by" language also is part of the text of § 523(a)(2)(B), the same analysis is applicable in nondischargeability cases under § 523(a)(2)(B). Considered as a whole, § 523(a)(2)(B) links in time:

> 1) money or credit,
>
> 2) obtained by the debtor,
>
> 3) by use of a materially false financial statement,
>
> 4) that was reasonably relied upon by the creditor when the original transaction was consummated.

For purposes of § 523(a)(2)(B)(iii), the term "creditor to whom the debtor is liable" necessarily is a temporal concept, relating to the creditor who extended credit to the debtor when the loan was made. It would be absurd to interpret it otherwise.

### E. *Policy Considerations*

■ The basic policy supporting discharges in bankruptcy is to give the honest but unfortunate debtor a fresh start. *Marrama v. Citizens Bank of Mass.,* —— U.S. ——, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007); *Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

The *Tooks* court discussed the policy considerations implicated by failure to make the exception to discharge provisions of the Code available to assignees:

> In the future, a dishonest debtor will know that he will be protected from the financial consequence of his wrongdoing in situations where a surety agrees to pay the victim. The debt will be paid by the surety to the victim/creditor and, since the surety would not have assignment rights, the debtor will be effective-

ly discharged from the consequences of his own willful and malicious conduct. *Tooks*, 76 B.R. at 164. The bankruptcy court below expressed the same concerns in the § 523(a)(2)(B) context: "Because really what you're saying to me it's okay to lie ... in order to get the credit because if you're really lucky somebody else will come along and purchase this debt...." Transcript of December 8, 2005 Hearing, pp. 35–36.

There is no policy expressed in the Bankruptcy Code to reward such dishonesty by debtors, and no such policy should be implemented in the absence of clear direction from Congress. The bare use of the term "creditor" in § 523(a)(2)(B)(iii) does not provide such clear guidance.

## VI. CONCLUSION

The principles of assignment, case law allowing assignees to prosecute § 727 denial of discharge and § 523(a)(2)(B) exception to discharge causes of action without imposing a requirement that the assignee establish a chain of reliance, the nature of fraud and when it occurs, and the policy considerations regarding the discharge of debts in bankruptcy all lead us to conclude that the bankruptcy court erred when it required, as a matter of law, that New Falls establish its own reliance, independent of Epic's, on the Personal Financial Statements as a condition to prevailing on a cause of action under § 523(a)(2)(B). The bankruptcy court erred as a matter of law in granting Pateel and Salpy's motions for summary judgment against New Falls on the § 523(a)(2)(B) causes of action. We REVERSE and REMAND.